UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| INTERNATIONAL INSURANCE AGENCY SERVICES, LLC, | ) ) ) | |
| Plaintiff, | ) ) | No. 04 C 1190 |
| v. | ) ) | Judge Joan B. Gottschall |
| REVIOS REINSURANCE U.S., INC., formerly known as GERLING GLOBAL LIFE REINSURANCE CORPORATION OF AMERICA, | ) ) ) ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the court is defendant's motion to compel arbitration and stay this action in its entirety. For the reasons set forth below, defendant's motion is granted.

**I. BACKGROUND**

International Insurance Agency Services, LLC ("IIS"), is in the employee benefits business; it provides various services in support of employee-sponsored insurance programs such as health insurance and life insurance throughout the United States. Compl. ¶ 4. Some of these programs are "fronted," which means that an insurance company issues the policy directly to the employees while simultaneously passing some or all of the risk to a reinsurer. *Id.* ¶ 5.

One such fronted program is "Lifetime Companion," a group term life insurance product that IIS developed, marketed, administered, and underwrote. Under this program, Companion Life Insurance Group ("CLIC"), an insurance company, offered the Lifetime Companion product to employees and their employers and dependents of those

employees. *Id.* ¶ 7. Revios Reinsurance U.S., Inc. f/k/a Gerling Global Reinsurance Corporation of America ("Revios") reinsured this program and retroceded a portion of the risk to Harbour Life and Reinsurance Company, Ltd. ("Harbour"), an affiliate of IIS. *Id.* ¶ 7.

IIS acted as the orchestrator of the Lifetime Companion program, bringing the various parties together.[1] Pursuant to a Managing General Underwriter agreement (the "MGU agreement"), CLIC granted IIS "exclusive authority to the marketing rights including, but not limited to, the rights to introduce, present, inform, market, sell and solicit to any and all parties and applicants." Blaine Decl. Ex. 1 Art. II, Section 1. Then, acting as CLIC's agent, IIS negotiated an agreement (the "reinsurance agreement") between CLIC and Revios, whereby Revios assumed the risk of this program. Finally, Revios and Harbour entered into a separate agreement (the "retrocession agreement") whereby Revios retroceded a portion of this risk to Harbour, an affiliate of IIS.

IIS alleges that "[i]n connection with the Lifetime Companion program, it earned commissions, profits and/or agency fees from CLIC, Revios and Harbour pursuant to a series of separate agreements by and among these companies." Compl. ¶ 8. There is no evidence of an agreement between IIS and Revios.

IIS claims that Revios "embarked upon a consistent and deliberate effort to interfere with business relationships that are critical to the success of IIS" (such as IIS' relationships with CLIC and Harbour) by: 1) attempting wrongfully to terminate its

---

[1] IIS' allegations regarding the specifics of its role in the Lifetime Companion program are vague. Revios contends that IIS, by virtue of the role it played in the program, appears to be the only party with any real interest in the contracts. Specifically, Revios contends that CLIC "simply rented its name to IIS' program to enable IIS to satisfy state licensing requirements, and IIS managed all aspects of the program." Def.'s Mem. 1. Similarly, Revios contends that there is no real distinction between IIS and Harbour; essentially, IIS "dominates and controls Harbour." *Id.* 5. However, the court is satisfied to rely on IIS' allegations and the underlying contracts to make its determination.

2

reinsurance agreement with CLIC and 2) attempting wrongfully to declare its retrocession agreement with Harbour "null and void ab initio." *See* Compl. ¶¶ 10, 11-12, 17-25.

As to the first charge, IIS claims that Revios provided notice (presumably to CLIC) in an attempt to terminate its reinsurance agreement with CLIC. *Id.* ¶ 12. This allegedly caused "chaos" among IIS agents, brokers, and clients, and eventually caused IIS to lose sales, business, revenues, profits, and fees. *Id.* IIS also alleges this behavior ultimately forced CLIC to terminate its agency agreement with IIS. *Id.* ¶ 12-14.

As to the second charge, IIS claims that Revios attempted to repudiate the retrocession agreement with Harbour due to the supposed failure of Harbour to maintain a line of credit. *Id.* ¶ 17. IIS alleges that in fact, Harbour maintained a letter of credit since December 1996 and as a result, Harbour was in full compliance with the terms of the retrocession agreement. *Id.* ¶ 21-22. Thus, Revios had no basis in law or fact to support its repudiation of the retrocession agreement. *Id.* ¶ 22. Revios further informed Harbour's auditors, Kaufman Rossin & Co., that the Harbour retrocession agreement was void ab initio, allegedly placing Harbour's solvency in question and jeopardizing Harbour's license to conduct business. *Id.* ¶ 25-26.

The parties dispute the legal nature of IIS' relationship with Harbour but IIS alleges that it suffered harm indirectly, due to the fact that "Harbour participates in a number of IIS programs, and IIS would lose substantial commissions and agency fees if Harbour were to lose its license." *Id.* ¶ 27. Further, IIS alleges that it has suffered significant damage to its reputation and both current and future relationships and programs. *Id.*

Based on these allegations, IIS accuses Revios of intentionally disrupting "IIS' valid business relationships and [interfering] with IIS' valid contractual relationships and current and future relationships." *Id.* ¶ 28. "As a direct and proximate result of wrongful conduct by Revios," IIS alleges it has been damaged in that it lost commissions, lost agency and other administrative fees, lost profits in the past and future based on loss of business, and suffered damage to its reputation. *Id.* ¶ 30.

Neither CLIC nor Harbour is named in this suit. IIS also does not allege that CLIC or Harbour breached a contract with IIS as a result of Revios' actions.

Revios asserts that this lawsuit must be submitted to arbitration pursuant to the arbitration clauses in both the reinsurance and retrocession contracts. IIS replies that because it is not a signatory to either agreement, the arbitration clauses do not apply to it.

## II. ANALYSIS

Under the Federal Arbitration Act, arbitration may be compelled if the following three elements are shown: a written agreement to arbitrate, a dispute within the scope of the arbitration agreement, and a refusal to arbitrate.[2] *See* 9 U.S.C. § 4 (2006); *see also Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005) (citing *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909-10 (7th Cir. 1999)).

Arbitrability is governed by federal law. *See Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417 (4th Cir. 2000) (Because the determination of whether a non-signatory is bound by a contract presents no state law question of contract formation or validity, courts look to the "federal substantive law of

---

[2] IIS does not assert that the arbitration clause in the agreements is not broad enough to cover the disputes at hand. Rather, IIS focuses solely on whether it, as a non-signatory, is bound by those clauses.

4

arbitrability" to resolve this question) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

In analyzing a motion to compel arbitration, a court must not reach the merits of the claim; it "must consider only the issues relating to arbitrability." *Hawkins v. Aid Ass'n for Lutherans*, 338 F.3d 801, 807 (7th Cir. 2003) (citing *We Care Hair Dev., Inc. v. Engen*, 180 F.3d 838, 844 (7th Cir. 1999)). "Once the court determines that an arbitration clause is enforceable, the status of the other contract terms is for the arbitrator to decide." *We Care Hair Dev.*, 180 F.3d at 844 (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967)).

Arbitration is contractual by nature. "A party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (7th Cir. 1995) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). However, the obligation to arbitrate a dispute is not limited only to those who have personally signed the written agreement. *See Zurich*, 417 F.3d at 687; *see also Int'l Paper Co.*, 206 F.3d at 416 ("[A] party can agree to submit to arbitration by means other than personally signing a contract containing an arbitration clause."); *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir. 1993); *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith*, 7 F.3d 1110, 1121 (3d Cir. 1993) (applying agency theory to bind a non-signatory to arbitration agreement when the principal is bound); *Letizia v. Prudential Bache Secur., Inc.*, 802 F.2d 1185, 1187 (9th Cir. 1986) (noting that "other circuits have held consistently that nonsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles") (collecting cases).

The Court of Appeals for the Seventh Circuit has recognized five doctrines through which a non-signatory can be bound by arbitration agreements entered into by others: (1) assumption; (2) agency; (3) estoppel; (4) veil piercing; and (5) incorporation by reference. *Zurich*, 417 F.3d at 687 (citing *Fyrnetics (H.K.) Ltd. v. Quantum Group, Inc.*, 293 F.3d 1023, 1029 (7th Cir. 2002)). Because it proves to be dispositive, the court considers only the estoppel theory.[3]

A non-signatory party is estopped from avoiding arbitration if it knowingly seeks the benefits of the contract containing the arbitration clause. For example, a third-party beneficiary of a contract is bound by the contract's arbitration provision. *See Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000) (non-signatory party seeking compensation through a distribution agreement is a third-party beneficiary required to arbitrate all disputes concerning that agreement with signatory); *see also Indus. Elecs. Corp. of Wis. v. iPower Distrib. Group*, 215 F.3d 677, 680 (7th Cir. 2000) (stating in dicta that a third-party beneficiary of a contract would be bound by an arbitration provision).

In order to compel a non-signatory to arbitrate under this theory, the non-signatory party must receive a "direct benefit" from the contract containing the arbitration provision. *See Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999) (compelling arbitration because the non-signatory boat owners received the benefits of lower insurance rates on their boat and the ability to sail under the French flag because of a classification agreement containing an arbitration provision, but for

---

[3] Revios has also argued that IIS is bound to the arbitration clauses of the reinsurance and retrocession contracts because it acted as CLIC's agent and because it is the alter ego of Harbour. Indeed Revios maintains that IIS negotiated both of the agreements at issue here. *See* Def.'s Mem. 4-5. The court finds it unnecessary to address these arguments.

6

which, registration of the boat would have been "practically impossible"). *Accord Zurich*, 417 F.3d at 688 (holding that a non-signatory could not be compelled to arbitrate when it was not seeking to enforce any rights it had under the agreement containing the arbitration provision and when in fact there were no benefits to the non-signatory under that agreement).

In considering whether a non-signatory party has received a "direct benefit" from a contract, some courts have relied on the non-signatory's own allegations regarding its relationship with the contract. "[A] party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him." *Int'l Paper Co.*, 206 F.3d at 417. In *In re Oil Spill by the "Amoco Cadiz"*, the Seventh Circuit compelled Amoco International, a non-signatory party to a contract between Amoco Transport and a tugboat company, to arbitrate its claim against the tugboat company because "by its own allegations" Amoco International's stake in the controversy was as Amoco Transport's agent. 659 F.2d 789, 796-97 (7th Cir. 1981). The court stated that "[i]t would advance neither judicial economy nor the purposes of the federal arbitration act to permit Amoco International to assert in a judicial forum claims grounded upon its alleged relationship to Amoco Transport and to allow it to disavow the relationship for purposes of arbitration." *Id.*

In *International Paper Co.*, the Court of Appeals for the Fourth Circuit held that the plaintiff was estopped from refusing to arbitrate its dispute when "its entire case hinge[d] on its asserted rights under [the contract containing the arbitration clause]." *Id.* at 418. In *International Paper Co.*, the plaintiff, who bought a defective industrial saw,

sued the manufacturer of the saw on the basis of a contract between the distributor and the manufacturer. *Id.* at 414. Though the contract between the distributor and manufacturer contained an arbitration clause, the plaintiff-buyer was not a signatory to the contract. However, no written contract ever existed between the buyer and the manufacturer. *Id.* at 414. In determining whether the arbitration clause in the distributor-manufacturer contract required the plaintiff-buyer to arbitrate its claims against the manufacturer, the Fourth Circuit stated that "[e]quitable estoppel precludes a party from asserting rights he otherwise would have had against another when his own conduct renders assertion of those rights contrary to equity." *Id.* at 417-18 (internal citations omitted). Because the contract between the manufacturer and distributor provided part of the factual foundation for every claim asserted by the plaintiff against the manufacturer, the court held that the plaintiff could not "seek to enforce those contractual rights and avoid the contract's requirement that 'any dispute arising out of' the contract be arbitrated." *Id.* at 418.

The principle that a party cannot use its relationship with a contract to allege liability but then disavow the arbitration provision in the contract is consistent with the notion that "the doctrine of estoppel prevents a party from having it both ways." *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 268 (5th Cir. 2004) (internal citation omitted); *see also Hughes Masonry Co. v. Greater Clark County Sch. Bldg. Corp.*, 659 F.2d 836, 839 (7th Cir. 1981) ("In short, (plaintiff) cannot have it both ways. (It) cannot rely on the contract when it works to its advantage, and repudiate it when it works to (its) disadvantage.") (punctuation in original) (internal citation omitted). With these considerations in mind, the court turns to the issue presented.

### A. *IIS Is Estopped From Refusing to Arbitrate Its Dispute With Revios*

Revios seeks to compel IIS to arbitrate its claim based on arbitration clauses in the reinsurance and retrocession agreements. IIS resists on the ground that it is not a signatory to either agreement and therefore has never consented to have its disputes resolved by arbitration. However, IIS' legal claims – as alleged in its complaint – are based entirely on harm it claims to have suffered due to Revios' repudiation or threatened repudiation of the reinsurance and retrocession agreements. For that reason, IIS is estopped by its own allegations from refusing to arbitrate its dispute with Revios.

IIS alleges that in December of 2000, Revios attempted to terminate the reinsurance agreement with CLIC for the Lifetime Companion program in violation of the termination provision "contained in the reinsurance agreement," causing "chaos" among IIS' agents, brokers and clients. Compl. ¶¶ 11-12. This "wrongful termination of the reinsurance agreement by Revios caused IIS to lose sales, business, revenues, profits and fees, and ultimately forced CLIC to terminate its agency agreement with IIS." *Id.* ¶14. IIS further alleges that "[t]his wrongful conduct," – presumably referring to Revios' wrongful termination of the reinsurance agreement – "also damaged IIS' relationship with the reinsurance intermediary on this program." *Id.* ¶ 16.

Similarly, IIS alleges that in December of 2001, Revios wrongfully attempted to repudiate the retrocession agreement with Harbour, even though Harbour was "in full compliance with the terms of the [r]etrocession [a]greement." *Id.* ¶ 22.

IIS relies on the reinsurance and retrocession agreements to show that Revios acted improperly even though IIS is not a party to either agreement. IIS cannot have it both ways. If it is going to use its relationship to the parties in the agreements to create

standing then it must also submit to the arbitration provision in the agreement. *See Amoco Cadiz*, 659 F.2d at 796 ("Having alleged an agency relationship as a basis for its standing in the suit, it cannot slough off that relationship at will."). The court is unable to see how IIS can litigate its claims without proving that Revios breached or attempted to breach the agreements containing the arbitration provisions. The essential issue in IIS' claim is Revios' compliance with the agreements containing the arbitration clause.

Furthermore, IIS' complaint demonstrates that it received – and expected to continue to receive – a direct benefit from these agreements. For example, IIS alleges that it earns commissions, profits and/or agency fees from CLIC, Revios, and Harbour in connection with the Lifetime Companion program "pursuant to a series of separate agreements by and among these companies." Compl. ¶ 8. By its own allegations, the reinsurance and retrocession agreements lie at the heart of the Lifetime Companion program. *See id.* ¶ 7 ("Lifetime Companion is an example of a fronted program. [CLIC] offered the group life insurance product known as 'Lifetime Companion' to employers and their employees and dependants of those employees. Defendant Revios reinsures this program, and retrocedes a portion of the risk to [Harbour]. Harbour is also an affiliate of IIS.") It is difficult to avoid the conclusion that IIS directly benefited from these agreements (and indeed expected these benefits to continue in the future) even though it did not sign the agreements.

IIS argues that it received no direct benefit from the agreements because neither agreement addressed the compensation of IIS. Pl.'s Opp'n 8. Rather, IIS earned fees under the MGU Agreement for the services it provides to CLIC. *Id.* Under this arrangement, CLIC pays all fees to IIS. *Id.* But IIS further explains that CLIC recovers a

portion of those fees from Revios via the reinsurance agreement, and Revios in turn recovers a portion of the fees it pays from Harbour via the retrocession agreement. *Id.* IIS' compensation is so intertwined with the agreements at issue that again, based on IIS' own allegations, it is difficult to conclude that IIS did not directly benefit from them. As was the case in *American Bureau of Shipping*, the MGU Agreement which provided IIS with its fees would not be possible but for the reinsurance and retrocession agreements. *See Am. Bureau of Shipping*, 170 F.3d at 353 (compelling arbitration based on arbitration clause in classification agreement when non-signatory boat owners received benefits "premised on the existence of a valid classification").

IIS is not seeking to enforce provisions of an agreement. However, its entire claim for liability rests upon its allegation that Revios breached the two agreements. The agreements provide the factual foundation for every claim asserted by IIS against Revios. IIS alleges that it has been damaged "as a direct and proximate result of wrongful conduct by Revios"; the wrongful conduct being the alleged wrongful attempt to terminate the reinsurance agreement with CLIC and the alleged wrongful repudiation of the retrocession agreement with Harbour.

   B. *Revios' Position As to the Validity of the Retrocession Agreement Does Not Prevent It From Enforcing Its Arbitration Clause.*

IIS' argument consists almost entirely of reminding the court that it is not a party to any contract that contains an arbitration clause. However, as demonstrated above, the rule that a party cannot be compelled to arbitrate unless it has agreed to do so is not absolute. IIS, through its own claims and allegations, falls within one of the exceptions to the rule compelling only signatory parties to arbitration clauses.

IIS also argues, without support, that Revios cannot seek to enforce a term of a contract that it has insisted is "void ab initio." This presumably refers to Revios' conduct regarding the retrocession agreement. This argument fails as well. The analysis that applies to whether a claim is subject to arbitration is distinct from the merits of either party's claims or defenses. *See, e.g. Hawkins*, 338 F.3d at 807; *see also Gersten v. Intrinsic Tech., LLP*, 442 F. Supp. 2d 573, 586 (N.D. Ill. 2006) ("[C]ourts have not required a movant, as the price of invoking applicable federal arbitration precedent, to concede substantive liability regarding relevant issues concerning the claims; the merits questions instead should be solved in arbitration.").

## III. CONCLUSION

For the foregoing reasons, Revios' motion to compel arbitration is granted. This action is stayed in its entirety until arbitration is complete, at which point the court will address any claims that remain unresolved by arbitration.

ENTER:

　/s/_____
JOAN B. GOTTSCHALL
United States District Judge

Dated: March 27, 2007